This is case number 4090627, Pontiac Flying Services, Inc. v. Schiffer. For the appellant, we have Michael Casey for the appellee. David... Is it Miller or Mueller? Miller. Thank you. Mr. Casey. May it please the Court. The record in this case and the briefs that are filed on this appeal establish that the plaintiff has failed to prove essential elements of the one claim that gave rise to 98 percent of the damages that were awarded in this case. And those essential elements are set forth in the breach of fiduciary duty jury instructions, which are uncontested for purposes of this appeal. And we see from those instructions in the plaintiff's case that the claim that this fiduciary duty arose in two different ways. First, arising from a joint venture, and the second arising from a relation of trust and confidence. Now, according to the jury instructions that were submitted on that particular claim, particularly with respect to the joint venture aspect of the fiduciary duty, the plaintiff was required to prove five essential elements of that claim, two of which are at issue on this appeal. One, whether the plaintiff proved that there was an agreement to form a joint venture. And secondly, whether the plaintiff proved that there was joint control or management over that joint venture. And that joint venture is with respect to the 03-05 STS contract. Let me stop you there. So the jury instructions specify that that's what needed to be proved? That is correct, Your Honor. Those five essential elements, that is correct. And the jury found them proved? The jury did find them proved. And our point on our directed verdict motion and the judgment notwithstanding, the verdict motion was that there was no proof with respect to those two essential elements of its claim. In particular, with regard to, for example, the requirement that it proved that there was an agreement to form the joint venture. We know that there was no written agreement. We know from the cases in this Court that in order to prove an implied agreement or implied contract, the plaintiff was required to show offer acceptance and consideration. In this case, the unequivocal testimony from the plaintiff's own president was that at no time did these parties ever discuss the financial terms of their relationship for the contracted issue, this 03-05 contract. It's also undisputed in this case that the only offer that was made to perform that contract, that was made by my clients, was actually rejected by the plaintiff. So when those are the facts in the record, where there was no offer that was ever accepted, there was no even discussion of the financial terms, there was no consideration as a result, there could not have been any type of an agreement expressed or implied to form a joint venture in this case. Was Mr. Miller trial counsel? Mr. Miller was not the trial counsel. What did trial counsel argue to the jury and to the court as constituting the evidence that addressed these points that, as you said, the jury had to find? Your Honor, to be honest with you, I don't believe he did. It's our position that the plaintiff essentially has ignored these two elements all along. They never alleged them, joint control or formation of a joint venture. They never proved them. And when we said in our brief that you have to show these to prove an essential element, there's nothing in their briefs to cite any record, excuse me, any facts in the record to prove the formation of a joint venture. I thought you said that was in the jury instructions, but you just made the statement they never alleged it. That is correct, Your Honor. They did not ever allege it. So how did it make its way into the jury instructions if it was not even alleged in the complaint? Well, that's a fair question. The case law in Illinois required the proof of those essential elements of the claim. We had filed a motion to dismiss the fiduciary duty claim because they had not alleged those two elements of its claim. But you did not file a motion to dismiss the Third Amendment complaint, did you? Well, didn't you just answer? Yes, but that's because the Third Amendment complaint, the fiduciary duty claim, which, by the way, now we're talking two weeks before trial, Your Honor, the claim was identical to that which we had just lost on the motion to dismiss. And so they just realleged that claim in the Third Amendment complaint. They cleaned up some allegations in the complaint. But we had just lost the motion to dismiss on those specific elements claiming that they had not alleged them and therefore they didn't have a claim.  Do you think, Judge, that the elements in the instructions of the jury are different from the elements that they pled? Your Honor, we – In other words, kind of resurrecting the – you know, Judge, if you dismissed our motion – Yes, yes, we did. You denied our motion to dismiss because we didn't plead this, but now here it is in the issues instruction appropriately if they had pleaded, but you ought to reconsider this. I don't know that we specifically put it in those terms, but we did say, Your Honor, we made the same argument there we're making now, which is that – Were you trial counsel? I did make the argument with regard to the directed verdict in joint – But you were there. I was there. I made the argument. And the argument that we made was on the directed verdict is similar to what I'm arguing now. They never alleged it and they never proved it. And that's with respect to this formation of an agreement to form the joint venture. That's one of the elements they didn't prove. The other one was they never proved that they had any joint control or management of this joint venture, another essential element as required by the jury instruction to prove. The facts of this case are just the opposite. The plaintiff never even performed that 0305 contract, could not have had any joint control or management over that contract from which they alleged that their damages flowed. The only possibility is to take a look at the one instance in which they worked together in the 02 contract. And as far as that was concerned, it's clear from the facts in this case that my clients were the general contractor of that particular project. They made all the decisions with regard to who did what. And there are no facts identified by the plaintiff at all anywhere in their briefs, Your Honor, in the record to establish that they proved that element of joint control. Counsel, this is a jury verdict, and the burden that you face to have a set-aside jury verdict is, I think, the highest that there is in law, where essentially it has to be no evidence or no reasonable jury could possibly have returned this verdict. I think the motion for directed verdict and the motion for judgment will be the same standard, which the record has to be essentially void of evidence. Your Honor, we're aware of that. We're aware we have a high burden here. We also have cited cases, however, that say that where a plaintiff has failed to prove the essential elements of a claim, then that's when the directed verdict is appropriately entered. That's when the JNOV is appropriately entered. And so what we're doing here on appeal is scouring this record to see was there any evidence, Your Honor, exactly in response to your question. Where is the evidence to prove agreement to form a joint venture? Where is the evidence to prove joint control or management? We said in our brief, our opening brief, there isn't any. In their response brief, they don't cite any. So we believe that that was a waiver, if you will, if not a concession, that no matter how high the standard is, there are no facts in this record to show that this plaintiff jointly controlled or managed the venture. There are no facts to show the formation and agreement to form a joint venture. Now that's with respect to one aspect of the plaintiff's fiduciary duty claim, that there was a fiduciary duty arising from a joint venture. The other theory that they had was whether a fiduciary duty arose from this relation of trust and confidence. Well, Your Honor, as this Court has held in Hensler and DeWitt, in order to prove that a fiduciary duty arises from a relation of trust and confidence, you have to prove by clear and convincing evidence each of the elements of that claim. One of which is... Was the jury instructed? Yes, Your Honor. The jury instruction on that particular theory specifically required the plaintiff to prove, among other things, number one, that he placed trust and confidence in the defendants, and secondly, and most importantly, as this Court held in DeWitt, that the defendants actually accepted that trust and confidence. And the jury instruction also said they have to prove that by clear and convincing evidence. So once again, as we've said in our appeal, you scour the record then to see what is the evidence that the plaintiff had to meet those two essential elements of that theory. Well, Your Honor, we have it from the plaintiff's president's own testimony on five separate occasions here within the critical time period that this plaintiff didn't trust the defendants. Oh, wasn't that only after the plaintiff could not get the pods back? Your Honor, well, that was when he was asking, but when he was making the effort to get the pods back. Before he ever went to Ovid, Michigan to ask for the pods, the plaintiff had indicated that he was distrustful of the defendants. So there's no evidence to show that there was trust up until the time that the pods were not returned upon request? I don't believe so, Your Honor. In fact, the only evidence that we find in terms of the plaintiff placing trust in the defendants is basically the plaintiff's testimony saying, I trusted them. When in fact, what we've seen from the facts is that on several different occasions the plaintiff didn't. Now, that's only one element. How about the fact that after the flying season or the dusting season, the plaintiff allowed the pods to be taken to what was to Reed's home, I guess, into the defendant's place of business? That sounds like trust to me. It doesn't really matter whether it sounds like it to me. Couldn't the jury have said that sounds like a situation where they put trust into the defendants? Your Honor, that is one aspect of the claim. The other aspect of the claim is that the defendants, they had to prove that the defendants actually accepted that trust. So if you find that there's a doubt about that first element, did they trust him or didn't they trust him, we think it's clear he didn't, he's got to prove it by clear and convincing evidence. But with respect to the defendants, focusing on the defendant's conduct, you know, in these fiduciary duty cases, as this Court held in DeWitt, it requires some reciprocity. As this Court said, we trust most people with whom we deal, but that doesn't make them all fiduciaries of ours. And the line that this Court drew in DeWitt was that you have to show that the defendants somehow or other accepted that trust, which ultimately, as Your Honor knows, is the highest duty imposed by law, so that the Court requires, there has to be some facts to show that the defendants accepted the trust. When the defendants accepted the pause, is that proof that the defendants accepted this highest obligation imposed by law to subordinate their own contractual interest to that of the plaintiff? DeWitt County wasn't a jury case. Pardon me, Your Honor? Wasn't DeWitt County decided by judgment on the pleadings and there was no jury finding? That is correct, Your Honor, but the fact of the matter is, what we're alleging here and claiming here is that as a matter of law, the law sets up the essential elements of the claim. In DeWitt, they found that as a matter of law, based upon the pleadings, that the plaintiff or the defendant, I believe, who had made the affirmative defense, had not established the elements necessary for that legal defense. We're saying the same thing in this case. That whether they were the allegations of the complaint or the facts in the record, they do not constitute a sufficient basis for finding that the element of the claim was met. And so that here, we take a look to see what was it that the defendants did to actually accept these fiduciary responsibilities. And, Your Honor, they haven't alleged anything or cited anything in their briefs to show how it was that the defendants agreed. And I want to emphasize this because it was emphasized in DeWitt. When you think about it, these are two commercial parties in this commercial transaction. The effect of this claim, that there's a fiduciary duty arising from trust and confidence, means that one of the parties to this commercial transaction has to subordinate its contractual interest to that of the plaintiff when they're negotiating over what the financial terms are going to be. And that's why I think DeWitt is so significant. Because it's a commercial of hardy case, unlike a typical fiduciary duty case where you have some degree of kinship or some disparity in the age and mental condition. And I want to go back to one essential point here, Your Honor, on this issue of fiduciary duty arising from trust and confidence. Keep in mind, under the decisions of this Court and under the jury instructions, they had to prove that by clear and convincing evidence. And so what we're claiming is that it is absolutely the case, given the facts of this case, that there were no facts to establish that the Schiffers, my clients, actually accepted that highest duty of a fiduciary in this case. And they clearly have not done so by clear and convincing evidence. Now, with respect to the issue of punitive damages, Your Honor, we've seen in the Illinois case law that there has to be some extreme conduct, some malicious or evil or outrageous conduct to warrant punitive damages. In this case, we also saw that the only conduct that Judge Travers found could warrant punitive damages was focused on the possession or the use of these pods. Okay? In May of 2003. Now, this is two weeks before this contract is supposed to start. They're supposed to go out on the East Coast and go to five or six different locations and spray all of these trees. And so the question at that point in time, then, is whether or not there was anything done in May of 2003 that would warrant punitive damages. Well, I think that the issue of what happened in May of 2003 is significant because it undercuts, I think, the whole notion of punitive damages and frankly explains a lot about what this case is about. Because this issue of how the defendants got the use of those pods, I think the single most important fact in this case, and it is an undisputed fact, is that neither the defendants nor the plaintiff ever had the right to own those pods. Those pods were owned by a non-party to this case, and that was Hurcon. And Hurcon owned the pods. They owned the property. Because Hurcon wanted the pods to be used, they wanted their flakes in the pods, the flakes could be dispersed. I thought plaintiffs had a right to possess the pods per a written agreement with Hurcon. Your Honor, that written agreement, and even the plaintiff would admit that that written agreement did not give the plaintiff ownership of the pods. And the written agreement also provides that Hurcon can ask for those pods back. And it also requires the plaintiff to cooperate with Hurcon with respect to the use of those pods. And I don't think there's any question, Your Honor, if you take a look at that letter, the facts of this case in particular, the testimony of the Hurcon witnesses, they testified that when they prepared that letter, they prepared it in such a way to make sure that they ultimately controlled how the pods were used because they wanted and they needed them used on that STS contract. That was the whole purpose of the pods. The whole purpose was so that Hurcon could use them or someone could use them on the STS contract so Hurcon could make money from them. There's no way, Your Honor, I submit, that you could take a look at that letter. There's no way you could conclude from that letter that this plaintiff had the right to put those pods in mothballs and prevent the defendants from using those pods or Hurcon from making money on those pods on that 0305 contract. The letter, I think, is pretty clear that it was a conditional use that the plaintiff had with respect to the use of those pods and that ultimately it was Hurcon's call. I think in a footnote of their brief, in footnote 9 on page 33, they grudgingly do it by saying give the devil his due. But the fact is that they believe that they are conceding in that footnote that ultimately the decision was Hurcon's as to who had the right to use those pods. So here what we find in May of 03, the contract is about to begin. The plaintiff is trying to prevent the defendants from using the pods and the plaintiff calls Hurcon and says, hey, don't let them use those pods. I have this letter. And Hurcon says, well, no. The letter is that the primary contractor on the STS contract gets to use the pods. We're going to make the call because the defendants have that contract and so ultimately I think what happened here, Your Honor, with regard to the letter that you referred to, I think the plaintiff thought it had a lot more out of this letter than it really did. Mr. Casey, let me ask you a question. This is a complicated factual situation, but it seems to me, because I'm trying to grasp what's happened here, that the position of the plaintiffs was that they had this contract, an arrangement with the defendants during 2002 and everyone was happy with it and made money and wanted to do it again and let's do it again and we're in this together and let's do it again. I think everyone was saying that. And the plaintiff's position, it seems to me, is that they believe that these representations, let's do it again, we were all happy with what happened in 2002, was enough to induce them to think that this was going to be a continuation for the 2003 to 2005 contract and that they were blindsided when suddenly the defendants said, oh, we want 10% more on, I guess, expenses. Is that it? Administrative expenses. Administrative expenses. Okay. What's the matter with that argument? If I'm assuming I'm paraphrasing. No, it is, and I think you paraphrased it quite well because they thought, based upon some assurances, that they had a deal. Well, Your Honor, in the prior argument, you were talking about mutuality of obligation and enforceable contracts. It's not just enough for one party to have an assumption about what might happen. There has to be a meeting of the minds in order to form an agreement, as this Court has held, I think, on the In re Marriage of Bennett case. There has to be mutuality. There has to be an enforceable promise on the part of my clients to ultimately pay the plaintiff what it wanted because that was the crux of the case. The defendant's position seems to be, well, yeah, we were in agreement to do this, but all the terms weren't there, including what we're going to pay. Is that correct or what? No, Your Honor, I think there's no question that they did the one contract, the two-month deal together in 2002. The defendants, my clients, they wanted to work with the plaintiff. They proved that they wanted to work with the plaintiff. The issue was on what terms. And so the ultimate issue here is was there a deal? Was there an agreement with respect to what those terms were going to be on the 03-05 contract? It was because plaintiff didn't get the terms that the plaintiff rejected the offer. Plaintiff's theory seems to be that when everyone talked after 2002 before 2003 and said let's do this again, that your clients were obligated to say, yeah, well, let's do it again and all, but we're not going to be able to do it necessarily at the same administrative expense level or something to that effect that they were induced into thinking that, gee, it's going to be the same terms. What's your response to that? Those cases that they cite that silence can somehow or other give rise to an enforceable promise, those cases that are silenced in conjunction with active concealment for fraud purposes. Your Honor, the only way I'm aware of where someone can deem silence as an acceptance of a contract or an offer is if there's some type of course of dealing. And we cited the course of dealing cases, and there are a number of them, which say if the parties have only worked together on one contract or on one occasion, that that cannot be enough to imply that the parties, or in my case, the defendants, have agreed to pay them what they want. Was 2002 the only time they worked together? The plaintiff had flown on an STS contract before, but the plaintiff never had possession of the pods before. The plaintiff had purchased Harold Miller's interest just prior to the 02 season. Thank you, counsel. You're out of time. Thank you, Your Honor. Mr. Miller. Thank you, Your Honor. May it please the court, the counsel, suffice it to say, we have profound disagreements with the counsel for the defendants. I'd like to take as a start the issue of the pods that was raised because I think it becomes a microcosm of what happened. The right to possession of the pods was clearly vested in Pontiac Flying. The argument being made is that this was a limited right constrained by who would have the STS contract, which brings me around to the truest test of a fiduciary. What we have here is the instance where Pontiac Flying put all of its reliance, trust, faith, and confidence in the Schiffers, with whom they had dealt under the 2002 contract to make the bid. The Schiffers had the pods because they had induced Pontiac Flying by a number of representations, none of which were true, to leave the pods with them. So you have the fiduciary relationship of Pontiac Flying's service. What were the untrue representations? One of the untrue representations, let us keep, well, starting out, that we're too busy to give you the pods back when they requested them, and he would have come and got them. Let us keep the pods. We're all in this together. We enjoy flaking with you. We want to make them more aerodynamic, which they never did. Was that untrue when they said it? Were they intending to do it, or were they trying to do it? They were never intending to make them more aerodynamic. Their only intent, and this is a manifest weight of the evidence, case in which the jury, based upon special interrogatories that they submitted, found every element of fiduciary relationship and fiduciary breach on the part of these defendants. But microcosmically, if we look at the pods, they are saying that the pods could be used only for the purposes of the STS contract. The fact that they had the pods and the fact that Pontiac Flying was relying upon them to bid the contract for their mutual benefit meant that Pontiac Flying was unable to bid the contract. And that goes into our cross-appeal to a degree. But in Ray v. Winter, the Supreme Court said, as a matter of law, when one undertakes to act as the agent of another, a fiduciary relationship arises. Why? Because the other is reposing trust and confidence in that person to act on their behalf. Does the fiduciary have to know that the other party is placing trust and confidence in them? I would say yes, and obviously here. This is one of those trust enigmas, as I point out in the brief, or one of those non sequiturs. How can they conceivably argue that there was no agreement when they've got the pods and they do not intend to make an agreement? They intend to string the plaintiff on by keeping the pods and making representations while they bid. Let me ask you the same question I asked Mr. Casey, and that is trying to get to the nub of what this case is about. It appears that after 2002, everyone was happy. It was successful, both the Schiffers and Pontiac Flying Services in talking about, let's do this again and so forth, and I guess that's what Pontiac Flying Services intended. And the Schiffers may have intended the same thing, and we know they may have intended the same thing, but at a different price. That is, had Pontiac Flying Services said, well, yeah, okay, the 20% instead of 10% administrative expenses is okay. We have an agreement. There would be no issue. Would there? That's right. There would be no issue. That's correct. So it seems to me that perhaps the fundamental problem here is that Pontiac Flying Services, in talking to the Schiffers after 2002, said, let's do this again, and they all agreed to do it again, and they assumed, and I'm wondering about the legitimacy of the assumption as a matter of law, that the terms should be the same. Why should they be able to assume that? They should be able to assume that because you have an ongoing relationship. Wasn't this the only time that the Schiffers and Pontiac Flying Services had ever done business together? That's correct. Harold Miller had done business with the Schiffers previously. The Pontiac Flying Service acquired the pods and stepped into Harold Miller's position, and I believe the relationship had been the same when Peterson was simply flying, except that Harold Miller got the share that Peterson and Pontiac Flying got after the 2002 contract, so you have established a course there of dealing and a reasonable assumption. Peterson never dealt with the Schiffers before, though.  Peterson, of course, had flown with them previously, and this time he flew the 2002 contract with them. They had no contractual relationship before 2002, so I'm having trouble understanding this ongoing pattern of conduct idea. Can it really be based upon one year or one contract? Sure. It can be based upon one year and one contract, based upon the inducements that were given and the course of conduct when we're talking about, as counsel put it, silence not being equated to concealment, but when you have silence which is coupled with overt conduct. Well, it seems to me, counsel, at the 2002, when they're talking about let's do this together, the Schiffers could have said, yeah, that's a great idea, but we're going to have to check our costs again and see if this is going to work out financially, or the Petersons could have said, let's do this again, and are we going to be able to do it at the same price? Now, either or both of them could have said this. Neither of them did. I'm wondering, how do we get a lawsuit out of the silence at either end? Well, if we look at the record, the testimony, I believe, of both the Schiffers was that Peterson was justified in believing that it would be done on the same terms because they had never indicated to the Petersons that it would be done on any other terms. That's my trouble, understanding the justification when they've never dealt with this before. They had this one contractual experience. The Schiffers say, let's do it again, and I'm just trying to think of another business relationship. Let's do it again next year. Well, why exactly should he assume that it's going to be on the same financial basis? From whence does that come, counsel? Well, what seems to be the indication here is that Peterson was not justified in relying upon the continuation of the joint venture, which was ongoing after the 2002 season through the settle-up, through the possession of the pods, through the promises which were continuing when Peterson said, I want to take the pods back. Now, if you had a simple situation where Peterson is back and Peterson has his pods, and Peterson is able then to go in and bid for the STS contract on his own, and I submit he would be the only person capable of performing it because he would have the pods, then you might be looking at the arm's-length dealing. If you're looking then at the deception, and this is what the jury found, then you were focusing upon the conduct. They didn't give the pods back at the end of the season because they intended to keep possession of the pods. They didn't give them back when he asked for them, and when we get to Rick Reed, Peterson goes down to, I believe it was Mattoon, to take them back because Reed was simply a pilot. Reed tells them that he had talked to the shiffers and they told him not to give the pods back. So we know that the scheme is afoot at that point. Why did Peterson go to Mattoon to get them? He went to Mattoon to get them because Reed was not bringing them back to him. There was no delivery back. As I recall, he had been trying to get them from Reed. Isn't that, though, inconsistent with your theory because that showed Peterson didn't trust him? Well, it's not a question of trust every step of the way. It is a question of trust being bestowed based upon the ongoing representations. Peterson, if we follow through thereafter, went to Ovid, Michigan and said, okay, I want my pods back. He had the perfect right to take those pods back at that time based upon the agreement with Hercon. Doesn't that show that Peterson didn't trust them again? And I'm getting to the nub of that one because I'm sure that we've all had the experience of being a little leery of someone until they make blandishments or representations. And while he's there, he said, ah, no reason for concern. We're going to do this deal together again. We had a wonderful experience and we just want to make these pods aerodynamic, so leave them with us. At that point, being reassured. And this is an active concealment on their part because why in the world would they tell Reed, who was not going to be aerodynamically engineering the pods, not to give them to Peterson unless something was afoot? They had the intention at that point in time of using a force majeure on Peterson by taking possession of the pods, which would have two effects. It would keep him from bidding on the contract and at the same time it would give them the pods so that they could bid and ultimately what they did was to exercise that. If I understand your argument, then plaintiff reposed trust in the defendant, but that trust dissipated when he couldn't get the pods back. Is that correct? Ebbs and flows. So when he can't get the pods back, they say, look, we want to work with you. We've had a good relationship. We're going to bid that contract and so forth. We want to make the pods more aerodynamic. Then we get to January and he goes back again with the digital product to take the place of the analog and they convince him yet again with the same blandishment. Is that ebb and flow consistent with the law on the creation of a fiduciary duty? Absolutely. Because you can be suspicious, but at the same time if someone is making the representations to you that everything is going to be fine, you're going to have... Do you have a case that says that? That you kind of have an ebb and flow on the reposing trust and that is enough to establish a fiduciary duty? Well, I submit that Ray versus Winter specifically says that when you rely upon someone to act as your agent, a fiduciary relationship arises thereby as a matter of law. And in Ray versus Winter... You introduced a new term there, agent. Are you saying there was an agency here? I'm simply taking the language out of Ray versus Winter. You can substitute when someone represents to you that they are going to conduct some business for you and on your behalf you can rely upon them to do so and an agency relationship arises thereby. You are reposing your trust and confidence in them to act on your behalf and here acting on their behalf was putting our trust in you to make this bid to get the contract which we can perform in the same fashion that we performed it in 2002. In their brief, their reply brief, the defendants allege that you were required to... The plaintiff failed to allege and prove rather joint control or management of the joint venture which they say was an element that you had to prove. In their reply brief they say you didn't even address that in your brief. Are they right? No. Why did you address it? Because if you go back, we are saying that you had... What they are doing is saying you've got a joint venture 2002. There is absolutely no doubt this was a joint venture between them in 2002. Well, they say in order to prove that you have to prove joint control or management of the alleged joint venture and they raise that in their brief and they say you didn't address it in your response. Are they right that you didn't address that? No. We pointed out that under the 2002 contract here is how the work was divided. Peterson provided two planes. Peterson provided five pods. Peterson provided two pilots and three members of the ground crew which he supervised and he proceeded to maintain the equipment. Going into 2003, of course, they couldn't have control because it was never the intention of the Schiffers to do business with them to begin with so there never was an ongoing relationship because of the Schiffer's breach. Well, what was the joint venture from when to when? The joint venture was an ongoing joint venture until the terms changed from 2002 under the same circumstances whereby Peterson would be providing the same equipment being the pods and Peterson would be providing the same manpower and the like. The testimony is there that they had discussed the bid and they had discussed the performance of the contract. What is the evidence to show that in 2002 the Petersons were involved in joint control or management of the whole venture? In a joint venture, this is one of the non sequiturs because that is not an element of a joint venture that you have to have joint control over every facet. You have control over portions of it. Well, how do you distinguish between being a hired contractor and being a joint venture? Is it one of those that you have at least whether you excise or not, you'll arguably joint control and management over the entire operation as opposed to this is what you do, I'm the boss, I'm telling you what to do? No, I do not agree with that. If we look at Meinhard versus Salmon, for instance, there was a clear joint venture and under the joint venture one of them was a passive investor. We set forth the cases in our brief that show a wide variety of their relationships. This is not where you've got two partners going down the road, each of them vested with equal control over the operation. Your definition of a joint venture would seem to include pretty much every subcontractor working on a house in the direction of the contract. No, because the key is a division of the profits and the losses by the pooling of capital and labor. And if you're getting a percentage out of it having contributed capital and having contributed the labor, then it is a partnership and a joint venture is nothing more than a partnership. Joint control or management of the joint venture is not an element? Not as to all aspects of it. You don't have to be equal partners, let us say equal in the control. Not to mention the fact that here it is undisputed that in 2002 this was a joint venture. I thought they disputed. The record is clear that this was a joint venture. I haven't heard them dispute that it was a joint venture. Were the terms of the defendant's agreement with Miller the same as the terms of plaintiff's agreement with defendants in 2002? That is my understanding. Was the defendant-Miller relationship considered a joint venture? And that is, yes, my understanding. And your understanding from the record is the 2002 association was also considered a joint venture? Yes, and I don't believe that there is any doubt at all about that. Then why does the opposing counsel say there is no evidence of a joint venture? I think that he is talking about in 2003, which is where we draw our line. There could not be an agreement on their part for this to be a joint venture in 2003 because they never intended it to be a joint venture. So they took the reliance on the part of Pontiac Flying and deprived Pontiac Flying of the opportunity to compete and the opportunity to perform. There could not have been joint control in 2003 to 2005 because the Schiffers wouldn't participate with Peterson. We have to go back to 2002. Counsel, you're out of time. Thank you. Rebuttal, please. Your Honor, I think we just heard that there's no question from the plaintiff's point of view that there was no joint controller-manager with respect to the contract that's at issue here, which is the 03-05 contract because the plaintiff never performed it. But we absolutely dispute that there was a joint venture in 2002. So his claim that you didn't is incorrect? That is absolutely incorrect. Well, do you dispute there was a joint venture with Miller? We do not, no. Absolutely there is a joint dispute with Miller. How could there be a joint venture with Miller and then you have exactly the same terms for 2002 but not a joint venture with plaintiffs? Well, first of all, they weren't the exact same terms because we don't have any terms between any written agreement or implied agreement between the defendants and the plaintiff, Your Honor. There is no such joint venture agreement. There was a written agreement between the defendants and Harold Miller. The defendants and Harold Miller went way back together, flying together, working together. They worked on the STS contract and developing that STS contract together. The mere fact that the plaintiff buys Miller's assets doesn't mean that the plaintiff all of a sudden steps into Harold Miller's shoes as far as a joint venture is concerned. Under the Illinois General Partnership Act, it's pretty clear that you can't become a partner in a partnership unless the other partners agree to it. If I have a law firm and I have three partners and one of them sells out to somebody that I don't want to be my partner, well, I'm sorry, it doesn't work that way in Illinois as far as I understand it. So you don't just step into somebody's shoes and try to acquire someone's experience by paying them money. In 2002, in order for there to be a joint venture, you still had to prove some joint control or management and there are no facts here. It's exactly, Justice, as you described it. They had certain duties that they were told to perform by the shiffers. The shiffers submitted the bid, they were awarded the contract, they accepted all the liability, they put all the pieces together, and this was a gargantuan task to perform this project. And it's clear from the record that the plaintiff did not have any of those management responsibilities with respect to 02 and clearly not with respect to 03 and 05. You know, we talk a little bit about whether there was an agreement here and it's interesting that it just so happens that one of the essential elements of the fiduciary duty claim is that they have to prove some form of agreement. But we have to step back for a moment and keep in mind that this case has been going on for seven years and not once during that entire period of time has this plaintiff ever alleged a breach of contract action. And I submit that the reason for that is because the plaintiff knew all along that those assurances in the form of, well, let's continue to work together, that were done in November of 02, never were sufficient for purposes of making it an enforceable promise such that the defendants could somehow or other be held to any particular commitment to perform under any terms for the 03-05 contract. With respect to the most significant term, the term that separated these two parties, the term of how much the plaintiff was going to be paid, the crux of the case is the plaintiff didn't get paid what it wanted to be paid. Why was that? Because the parties never reached an agreement as to what those financial terms were going to be. Justice, you made a point here that has not really been addressed too much in this case, and that is, you know, if the plaintiff keeps saying, well, I didn't have any reason to believe this or I didn't have any reason to believe it was anything different, you know, there's an undercurrent here. Well, the plaintiff has a responsibility too. It's a commercial party to this commercial transaction. Why doesn't the plaintiff know how much it's going to be paid and why hasn't the plaintiff ever negotiated the term that it was so concerned about in this particular case? That never happened in this case. Now, ultimately, I believe that this case is not about fiduciary duty or trade secret or punitive damages. It's about a commercial transaction between two commercial parties. Now, in this case, this plaintiff basically gave up $1 million worth of work in exchange for a seven-year-long lawsuit and never alleged breach of contract because he never had a contract, and without a contract, you're not entitled to be paid anything. And so we have all these theories about the pods, but it's all answered by that one fact, Hurcon owned the pods. Neither of these two parties did. It was Hurcon's decision to let the defendants own the pods, and that was not sufficient to give rise to any punitive damages in this case. Your Honors, finally, we've heard a lot about my clients, Mike and Al Schiffer, and the type of conduct they engaged in in this case, which I think are very unfortunate charges against their character. It's certainly different than what I understand their character to be, having lived with them for a month during this trial. But I have to say that my concern about this case is not solely with my clients because I believe that this case as it presently stands is bad precedent in Illinois. I believe that it's an unwise extension of the law of fiduciary duty and punitive damages in commercial transactions, and that if a line is going to be drawn to distinguish between commercial and fiduciary relationships, well, that line should be drawn in this case, which involved nothing more than two commercial parties in a commercial transaction. Thank you very much. Thank you, Counsel. The case is submitted. The court will stand in recess until 1 o'clock.